## Case No. 15,179.

UNITED STATES v. The F. W. JOHNSON.

[18 Leg. Int. 334.] [1]

District Court, D. Maryland. Sept. Term, 1861.

CONSTITUTIONAL LAW—REBELLION AND SECESSION OF STATES—BELLIGERENT RIGHTS—PRIZE—ENEMY PROPERTY — ENROLLMENT AS EVIDENCE — BREACH OF BLOCKADE.

[1. Where states have assumed to secede from the Union, and the government has raised large armies, which are engaged in actual war in endeavoring to put down the rebellion, and the functions of the United States courts are entirely suspended in the rebellious territory, the government of the United States is entitled, by the constitution and by international law, to exercise belligerent rights, as determined by the rules applicable in cases of prize and blockade.]

[2. The fact that a vessel is enrolled in a port of a rebellious state is not conclusive that such port is the domicile of her owner, so as to make her enemy property: and it is competent to show that the owner is, in fact, a resident of another port in a loyal state, and thus avoid condemnation.]

[3. The domicile of the owner at the time of the capture of the vessel determines whether she is of a hostile character or not.]

[4. Where a foreign vesel, laden with railroad iron consigned to a port in a loyal state, was driven ashore on the coast of Virginia and wrecked, and thereafter a wrecking vessel was sent in good faith to rescue the cargo, and bring it to the port of destination, held that, upon the capture of the latter vessel while taking on cargo from the wreck. there was no ground for condemnation for attempted breach of blockade, although it was the intent to land the rescued property temporarily on the shore, until it could be conveyed to the loyal states.]

Prize.

GILES, District Judge.   This is a libel filed on behalf of the United States to forfeit the schooner F. W. Johnson as a prize of war. The bill alleges that the said schooner was captured by a vessel of war of the United States, about twenty-five miles to the southward of Cape Henry, in the Atlantic Ocean, having on board at the time about twenty-eight tons of railroad iron; that the said cargo of railroad iron was saved by the said schooner for the use of the Norwegian bark Albion, which had been cast away about the 1st of May last, at the spot where the capture was made; that the said schooner belonged to the port of Norfolk, in Virginia, and was owned by citizens of said state, a state at that time claiming to have separated from the United States, and, with other Southern states, then waging open war against the United States by the various modes of warfare usual among hostile nations; and that the said schooner left her port in Virginia bound to some port south of Maryland, with intention to discharge her cargo in such Southern port.

Before I discuss the facts of this case, as presented to the court in the pleadings, answers to the interrogatories in preparatorio, and other evidence in the case, I will state

1 [Reprinted by permission.]

what I believe to be the law of nations in reference to the first question which has been so ably argued by the learned counsel. It has been contended by the counsel for the claimants that in the present unhappy division in our country the government at Washington has no power, either under the constitution of the United States or by the recognized principles of the law of nations, to treat the inhabitants of the states which claim to have seceded, as enemies, and to exercise in reference to them those belligerent rights which all concede belong to parties engaged in a public war. And by a public war is here meant a war between independent sovereign states. Now, I am sitting in this case, in a prize court, and the supreme court said, in the case of The Rapid, 8 Cranch [12 U. S.] 155, and The Adeline, 9 Cranch [13 U. S.] 264, "that the law of prize is a part of the law of nations." And I am, therefore. to decide this question by the principles of that universal law to which all civilized princes and states acknowledge themselves to be subject.

In the first place let us see what is the character of the present contest in this country, and in what light it has been regarded by the executive and legislative departments of the government. In the face of all that is passing around us, it needs no argument to show that a civil war of gigantic dimensions is sweeping over the land. We are almost within sound of the cannon of two of the largest armies that have ever been marshalled in hostile array against each other on this continent. More than one-third of the confederacy has claimed to separate from the rest, and they are now fighting about the construction of the organic instrument of the government,—one side alleging that under a true construction of the constitution each state has a right to withdraw from the Union whenever its people so determine; the other, that no such right exists, and that to attempt to secede is rebellion, and not the exercise of any constitutional right. And in the states which have claimed the right to withdraw, there are now open no courts of the United States, and the laws of the United States cannot now be executed in those states by the ordinary course of judicial proceedings.

Is this not civil war? And has it not been so regarded by the executive department of the government? This is clear from the proclamations of the president of the 15th of April, of the 19th of April, of the 27th of April, and of the 3d of May and of the 10th of May,—all recognizing the fact that the civil power of the government is no longer capable of enforcing the laws, and calling to its aid the power intended to be provided by the acts of 1795 [1 Stat. 424] and 1807 [2 Stat. 443], and also, using the power of blockade, a war power belonging only to belligerents either in a civil or foreign war. And the legislative department has also recognized this

contest as a war. For, during the last session of congress, it not only did so by the laws which it passed for the raising of armies and providing means for their support, but in express language, on four different occasions, as will be seen in reference to the laws of the extra session of July last. [12 Stat.] pp. 268, 274, 315. 326. And the last law (page 326) to which I refer, not only recognized a war as existing, but it approved and sanctioned all the proclamations of the president, thereby making valid the blockade declared by the president in his proclamations of the 19th and 27th of April, if the president alone, "as commander in chief of the army and navy of the United States," did not possess this power under the existing circumstances of the country.

The supreme court (Chief Justice Taney delivering the opinion). in the case of Luther v. Borden, 7 How. [48 U. S.] 45, say: "Unquestionably a state may use its military power to put down an armed insurrection, too strong to be controlled by the civil authority. The power is essential to the existence of every government, essential to the preservation of order and free institutions, and is as necessary to the states of the Union as to any other government. The state itself must determine what degree of force the crisis demands, and if the government of Rhode Island deemed the armed opposition so formidable and so ramified throughout the state as to require the use of its military force, and the declaration of martial law, we see no ground upon which the court can question its authority. It was a state of war, and the established government resorted to the rights and usages of war to maintain itself and overcome the unlawful opposition."

Now, what say the writers on the law of nations? Vattel says, in book 3, c. 18. p. 425: "When a party is formed in a state who no longer obey the sovereign, and are possessed of sufficient strength to oppose him, or where, in a republic, the nation is divided into two opposite factions, and both sides take up arms, this is called a civil war. Some writers confine this term to a just insurrection against their sovereign, to distinguish that lawful resistance from rebellion which is open and unjust resistance. But what appellation will they give to a war which arises in a republic torn by two factions. or in a monarchy between two competitors for the crown? Custom appropriates the term of civil war to every war between the members of one and the same political society."

And Wheaton, in his great work on International Law, says, on page 365: "A civil war between the different members of the same society is what Grotius calls a mixed war. It is, according to him, public on the side of the established government, and private on the part of the people resisting its authority. But the general usage of nations regards such a war as entitling the contending parties to all the rights of war as against each other, and even as respects neutral nations."

Judge Chase, of the supreme court. in the case of Ware v. Hilton. 3 Dall. [3 U. S.] 199. speaking of the effect of the act of the Virginia convention in June, 1776, and the declaration of independence by congress on the 4th of July following, says: "Before these solemn acts of separation from the crown of Great Britain. the war between Great Britain and the United Colonies, jointly and separately. was a civil war; but instantly, on that great and ever-memorable event, the war changed its nature, and became a public war between independent governments; and immediately thereupon all the other rights of an independent nation attached to the government of Virginia." Whether the learned judge be correct in his view. that the war became a public war after the declaration of independence, a view he may be excused for taking. if wrong, as his own name was appended to that imperishable document, we have the sanction of his great name to the doctrine that to such a contest there belonged all the rights of war. I am therefore clear in the opinion that as a blockade is an acknowledged belligerent right under the law of nations where war exists. the blockade of the Southern ports was lawfully proclaimed by the president.

In the discussion of this question I have said nothing in reference to sovereign rights of the government: whether it may not at the same time exercise both sovereign and belligerent rights. Such a question does not arise in the case. I have confined myself to the examination of the existence or not of belligerent rights by the government in reference to the present unfortunate state of the country. And Phillemore, in his Commentaries on International Law (volume 3, p. 740). gives us a simple rule by which to determine this question. He says: "In the case of a civil war, the English law furnishes a good criterion as to whether the country is to be considered at peace or at war—that whenever the king's courts are open it is a time of peace. in judgment of law." Judged by this standard. then. as the federal courts are closed in the Southern states, there is a state of civil war. And the government is remitted to its belligerent rights, to be exercised in accordance with those maxims of humanity, moderation and honor, which the law of nations has prescribed to be observed by both parties in every civil war.

Sitting in a court of the captors, adjudging a question of prize, I am to decide whether this vessel and cargo can be condemned upon either of the grounds alleged by the district attorney. He contends that the ship and cargo are to be condemned as enemy's property, and if not such, to be condemned because there was committed a breach of blockade. Now. as both these grounds involve

questions of fact, as well as questions of law, let us see what are the facts of the case as presented in the pleadings and evidence. The schooner F. W. Johnson is owned by a certain Holder Almy. a resident and citizen of the state of Rhode Island. That he has been for the last five years largely engaged in the business of wrecking along the Atlantic coast, owning some other vessels. and was frequently called by his business to Portsmouth and Norfolk, in Virginia. That he married a lady in one of those places, and as his business permitted, passed much of his time there, but left there for his home in Rhode Island about the time of the bombardment of Fort Sumter. That he purchased the F. W. Johnson in Norfolk some five years since, and caused her to be enrolled in Norfolk on the 5th of July, 1856, and losing the certificate of that enrollment, he enrolled her again at the same port on the 29th of September, 1858, under which she has been sailing since. The last coasting license, which recites the enrollment of 1858, was taken out at Norfolk on the 2d of March last.

In the enrollment Holder Almy is mentioned as "of the city of Norfolk, state of Virginia," but he only swears "that he is a citizen of the United States." The said schooner was at the time of her capture, sailing under the flag of the United States, and her captain and crew were all citizens of Massachusetts or Connecticut. These are all the facts in reference to the question of ownership. The district attorney contends that, inasmuch as the enrollment recites Holder Almy as of Norfolk, Virginia, he cannot contradict it. so as to relieve his vessel from condemnation as enemy's property. Now, when this enrollment was made, Holder Almy was for a temporary purpose at Norfolk. where he purchased the vessel, and where it was perfectly legal for him to enroll her, if he was not absolutely required to do so by our registry and enrollment acts. See Act Dec. 31. 1792. § 11 [1 Stat. 292], and Act Feb. 18, 1793. § 2 [1 Stat. 305]. Norfolk was then a part of the United States, acknowledging its allegiance to the government. and where the officers of the government granted the license and made the enrollment which have been given in evidence in this case.

Now. is an enrollment anything more than prima facie evidence of ownership or of the residence of the owner? May not the true state of the facts be shown by the evidence— the question being, was the domicil of the owner at the time of the capture in an enemy's country, and not what may have been his residence at any former period? It is true, the owner who makes the oath in the custom-house, to enable him to obtain the enrollment, would not be heard in a court of justice to dispute the facts he had sworn to, but he could show any facts not inconsistent with the oath he had taken. For instance, he could show. that although he is named as sole own-er, the equitable interest in a moiety of the vessel is in other parties (see case of Weston v. Penniman [Case No. 17,455]), or that since the enrollment his domicil has been changed. In the case of the ship Resolution and cargo, in the federal court of appeals in 1781. that court, in [Miller v. The Resolution] 2 Dall. [2 U. S.] 23. say (speaking of the ship's papers). "that every commercial country has directed by its laws that its ships shall be furnished with a set of papers called the 'ship papers.' And this criterion the law of nations adopts in time of war to distinguish the property of different powers when found at sea; not indeed as conclusive. but presumptive evidence only."

Bills of lading, letters of correspondence, and all other papers on board which relate to the ship or cargo, are also considered as prima facie evidence of the facts they speak. They say again, "if the papers affirm the ship and cargo to be the property of an enemy, there must be a condemnation. unless they who contest the capture can produce clear and unquestionable evidence to prove the contrary." It will be found on reference to the case of Dudley v. The Superior [Case No. 4,-115], that Judge Leavitt (of the United States district court of Ohio) held that as the Superior had been enrolled at Buffalo. the enrollment was prima facie evidence that she belonged to the port of Buffalo at the time of her registry. He says: "It is true, in controversies between the owners of a vessel involving a question of title merely, the enrollment is not even prima facie evidence." "When offered to show title in the person making it. it is wholly inadmissible as evidence, for the reason that it is proof only of his acts. and cannot be received against other parties. But upon an incidental question. not affecting the title of the parties. it is competent evidence. and unless contradicted by clear evidence. will be held conclusive as to the port or place to which the vessel belongs." In the case of U. S. v. Brune [Id. 14.677]. Judge Grier decided that in a criminal prosecution against one of the crew of an American vessel, the registry was not even prima facie evidence of ownership, to show the American character of the vessel. I therefore am of the opinion that in this case the enrollment and license were only prima facie evidence that Holder Almy. the owner of the said schooner, was a citizen of Virginia. As further authorities on this question, see the following cases: Bradbury v. Johnson. 41 Me. 582; Brooks v. Minturn. 1 Cal. 482; Stokes v. Carne, 2 Camp. 340.

Now, as I said before, the domicil of the owner at the time of the capture of the vessel, determines its character as hostile or not. In the case of The Ocean, 5 C. Rob. Adm. 91, Sir Wm. Scott decided that a British merchant settled in Holland. at the breaking out of hostilities. but taking early measures to remove, was entitled to restitution of his prop-

erty seized as enemy's property. And the same doctrine was maintained by the supreme court in the case of The Venus, 8 Cranch [12 U. S.] 253. Justice Washington, in delivering the opinion of the court, says, speaking of a domicil acquired in a foreign country: "But this national character which a man acquires by residence may be thrown off at pleasure by a return to his native country, or even by his turning his back on the country in which he has resided, on his way to another. To use the language of Sir Wm. Scott, it is an adventitious character gained by residence and which ceases by non-residence. It no longer adheres to the party from the moment he puts himself in motion, bona fide, to quit the country sine animo revertendi."

Now, tested by these decisions, this vessel belonged at the time of her capture to Rhode Island, for Capt. Stoddard swears in his claim and answer that Holder Almy left Norfolk about the time of the bombardment of Fort Sumter, and returned to his home in Rhode Island. And there is nothing in the case to cast the slightest suspicion on this statement. The cargo belonged to certain underwriters of the city of New York to whom it had been abandoned by the Baltimore & Ohio Railroad Company. There cannot, therefore, be any condemnation of either the vessel or cargo as enemy's property.

Now, as to the other ground of condemnation alleged by the district attorney—the breach of blockade. What are the facts in reference to this question? It appears that some time previous to the 1st of last May, upwards of six hundred tons of railroad iron were shipped from England in the Norwegian bark Albion, bound to this port, and consigned to the Baltimore & Ohio Railroad Company, the purchasers thereof, and who had caused it to be insured in the New York insurance offices. That the said bark, while proceeding on her said voyage was, about the first of May, wrecked upon the Atlantic coast, about thirty miles south of Cape Henry, and lay there about one-fourth of a mile from the shore. Under these circumstances the railroad company abandoned it as for a total loss, and James Carey Coale, the agent of the New York underwriters, entered into a contract with Capt. Baker, the mate of said schooner, to send her down to the wreck to save as much of the iron as possible.

That the said schooner F. W. Johnson about that time came up to the port with a cargo saved from a wreck near Smith's Point, in the Chesapeake, and left here about the tenth of May to fulfill said contract, so made with the agent of the underwriters. That they went first to New Inlet for a harbor, and reached the wreck of the Albion about the 1st of June, and found it in a most exposed situation, liable to go to pieces in the first storm. That they proceeded to take iron from her, and had succeeded in getting twenty-seven tons on board when they were captured. That they intended to land said iron, as soon as they could get it out, at New Inlet, being the nearest land on which they could safely deposit it, until it could be removed to Baltimore, to which port they intended to bring it—as it was important, from the exposed condition of the vessel, to remove the iron from it as fast as possible. That New Inlet is an uninhabited part of the coast, one of those small inlets between the ocean and Pamlico Sound, and about twenty miles from the main land and seventy miles from the nearest port of entry, Edenton, in North Carolina. These distances I learn from an examination of the map of that state. It is at the north end of the Chickconacomo bank, that long ridge of sand thrown up by the Atlantic, and which separates it from Pamlico Sound. On a map exhibited in court during the trial, the water in New Inlet was marked 2½ feet deep; through which there is no passage for vessels into the sound, and I suppose it is gradually closing up by the sand washed up from the ocean, as I find, on examination of the map of North Carolina, that two inlets north of New Inlet, Currituck Inlet and Roanoke Inlet, are now closed.

Now it is perfectly clear from all the evidence in the case that there was no intention to violate the blockade by any party connected with the F. W. Johnson. They went there in good faith to save the wrecked property of loyal citizens, and every witness examined negatived the idea that there was any intention to carry this iron or any part of it into North Carolina. Now the purpose of a blockade is to prevent all commercial intercourse with the interdicted port. Says Phillemore (volume 3, p. 292): "The object of a blockade is to prevent exports as well as imports, and to cut off all communication of commerce with the blockaded place." Now, do the facts of this case show any breach of a blockade, as thus defined? Certainly it would not have been contended that any breach of the blockade had been committed if the master and seamen of the bark Albion had, on their being wrecked, with their small boats made the effort to save the cargo, and to enable them to do so, had carried it to the nearest place of safety with the intention of removing it to the port of destination, Baltimore.

Now, how is the case altered, when, instead of the ship's crew, the effort to save the cargo is made by professional wreckers employed by the owners? Is it not such a case of necessity as excuses the national offense. Says Phillemore (volume 3, p. 61), speaking of a decision of Lord Stowell: "The law of cases of necessity, he observes, is not likely to be furnished with precise rules; and whatever is reasonable and just in such cases is likewise legal. It is not to be considered as a matter of surprise, therefore, if much instituted rule is not to be found on the subject. A clear necessity is a sufficient justification for every thing that is done fairly and with good faith under it."

Now, tested by this standard, is it not rea-

sonable and just that the owner of goods, cast upon the shores of a blockaded country by a storm of the ocean, should be permitted to make every exertion to save them for the purpose of carrying them to the destined port? The principle of excuse from necessity will be found to have received the sanction of the supreme court in the case of The Mary, 9 Cranch [13 U. S.] 126. Chief Justice Marshall, and I can name no higher authority, in delivering the opinion of the court, says: "The Mary was forced into Waterford by irresistible necessity, and was detained there by the operation of causes she could not control. Had her departure been from a neutral port, and she had been thus forced, during the voyage, into a hostile port, would it be alleged that she had incurred the liabilities of a vessel sailing from a port of the enemy? It is believed that this allegation could not be sustained, and that it would not be made."

The same principle was sustained by Sir W. Scott in the case of The Charlotta, Edw. Adm. 252. That was the case of an American ship on a voyage from Boston to St. Petersburg, putting into the Texel, in distress and for repairs, Texel then being under blockade, That learned admiralty judge, on being satisfied that there was a necessity for her going into the Texel, restored the ship and cargo. He also maintained the same principle in the case of The Fortuna, 5 C. Rob. Adm. 27. I think that principle covers this case, and I will sign a decree restoring the vessel and cargo to the claimants upon the payment of the costs of the case. I charge them with the costs, because the enrollment, which was the only evidence the boarding officer had at the time, recited that the schooner belonged to a citizen of Virginia, and justified her capture and her being sent into a prize court for adjudication.